Filed 7/24/13  In re R.R. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re R.R. et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>R.K.,<br><br>      Defendant and Appellant. | A136556<br><br>(Contra Costa County<br>Super. Ct. No. J11-01084, J11-00808) |

R.K. (mother) appeals from an order terminating her parental rights over her daughter, K.R., and her son, R.R., Jr.  Her sole contention on appeal is that the notices provided to tribal authorities under the Indian Child Welfare Act of 1978 (25 U.S.C. §§ 1901-1963 ( ICWA)) were inadequate.  We conclude that any shortcomings in the notices were harmless, and we therefore affirm.

## FACTUAL AND
## PROCEDURAL BACKGROUND

This case began when health-care providers in Contra Costa County examined K.R. in January 2011.  K.R. was just over a year old at the time, and she had gained only a pound during the previous six months.  The health-care providers concluded that K.R. was in grave danger of malnutrition, and they contacted Contra Costa Child Protective Services, which in turn notified the Walnut Creek Police Department.  A police

1

investigation ensued, and K.R. was taken into temporary protective custody when she and mother were found at the Walnut Creek home of mother's aunt and uncle.

Mother and father, R.R., Sr., were living in Petaluma at the time. Since they were not living in Contra Costa County, this case was initiated by the Sonoma County Human Services Department (Department) filing a petition seeking to have K.R. declared a dependent of the court. The Department alleged that mother failed to provide K.R. with adequate food, care, supervision, and medical treatment, and that father failed to intervene and protect K.R. (Welf. & Inst. Code, § 300, subd. (b).)[1]

In the petition, the Department noted that before the case was filed mother had mentioned possible Native American ancestry of "Sisika (Blackfoot) and Apsalooke (Crow) Heritage on maternal side of family."[2] Throughout the ensuing dependency proceedings that lasted over a year and a half, mother never again reported or intimated that she might have Crow heritage.

After the Department filed the dependency petition, mother completed the judicial council form (ICWA-020) used by parents and others to identify a minor's possible Native American ancestry. A box next to the statement "I may have Indian ancestry" was checked, and there was a notation "Sisika/Blackfeet/Montana." Father filled out his own ICWA-020 and reported that he had no known Native American ancestry.

The detention hearing was held in early February 2011, and the trial court discussed the ICWA-020s with mother and father. Mother again expressed her belief that she had Blackfeet-Siksika ancestry but said she did not know if any relative lived on a reservation, received tribal benefits, or was an enrolled member of a tribe.

A week after the detention hearing, the Department sent the judicial council form used to notify tribes that a child in a dependency proceeding may be an Indian child (ICWA-030) to the Blackfeet Tribe of Montana, the Sacramento Area Director of the

---

[1] All further references to California statutes are to the Welfare and Institutions Code.

[2] Sisika appears to be a misspelling of "Siksika," meaning Blackfoot or Blackfeet Indians or a band of the Blackfoot Confederacy. (15 Oxford English Dict. (2d ed. 1989) pp. 463-464.)

2

Bureau of Indian Affairs, and the Secretary of Interior in Washington D.C. In addition to including information about K.R., mother, and father, the ICWA-030 included the names of K.R.'s maternal grandparents and the names of two of her maternal great-grandparents. The notice identified the two relatives who were believed to have Native American heritage: grandfather James H., and great-grandfather Danual H., Sr. A birthplace and birth date were provided for James H., and a birthplace, place of death, and partial birth date were provided for Danual H., Sr. The notice provided no addresses for, or other information about, these relatives.

The Department's jurisdiction report contained the following narrative regarding ICWA status: "The mother stated that she has Native American heritage on her father's side of the family specifically that her paternal grandfather, Danual H., Sr., was full Blackfoot. The mother denied having any Native American heritage on her mother's side. A family history was obtained from the mother, after a request was made through her attorney, and notices have been sent to all appropriate parties." The report also noted "mother stated that she is Ethiopian, Native American, and Japanese." At the jurisdiction hearing held in late February 2011, the juvenile court found that there was insufficient evidence to determine if K.R. was an Indian child, and it ordered mother and father to assist in the ICWA investigation.

The Blackfeet Tribe responded to the ICWA-030 notice in March 2011. The Tribe reported that neither K.R., her mother, James H., nor Danual H., Sr., was listed on the tribal rolls. The Tribe thus concluded that K.R. was not an Indian child as defined by ICWA. The Bureau of Indian Affairs also responded to the Department's notice, but it left the ICWA determination to the tribal representative. No response from the Secretary of the Interior is noted in the record. Relying on the response from the Blackfeet Tribe, the Department concluded ICWA did not apply in K.R.'s case.

In May 2011, a Sonoma County court investigator contacted several relatives of mother, and tribal issues were discussed. Mother's sister in Massachusetts told the investigator that mother's mother (the maternal grandmother) was paranoid schizophrenic, and that the family had always suspected that mother also suffered from

3

mental illness. The sister discussed mother's irrational belief that a teenage nephew was mother's own child. According to the sister, mother had said she would use "tribal counsel [*sic*]" to gain custody of the nephew. The investigator reported: "[Sister] confirmed that they are not affiliated with any tribal counsel [*sic*] and have never received any benefits." The investigator also contacted another sister, an aunt, and mother's father, James H., the person mother identified as having Native American ancestry. James H. reported he had not seen mother in a few years but had noticed her mental illness early in her life and had made a mistake in not getting her help. The investigator noted that mother was uncooperative in providing details about her relatives: "[i]t appears as though mother did in fact know where her relatives were, but for whatever reason did not want to give the Department that information."

While K.R.'s case proceeded in Sonoma County, mother gave birth to a boy, R.R., Jr., in spring 2011 in Contra Costa County. Respondent Contra Costa County Children and Family Services Bureau (Bureau) immediately filed a dependency petition and placed R.R., Jr., in emergency foster care. The petition alleged that R.R., Jr., was at risk of harm given the parents' abuse of, and inability to care for, K.R. A Bureau report prepared for the detention hearing incorporated information from the Sonoma County dependency proceeding and noted that mother had claimed Native American ancestry in that proceeding.

In July 2011, the Sonoma County juvenile court found true the Department's allegation that K.R. had suffered severe physical abuse at the hands of mother. The court declared K.R. a dependent of the court and found IWCA did not apply to her case. The court then transferred the case to Contra Costa County because mother and father had moved there.

Around this time, mother and father each completed a second ICWA-020, this one for R.R., Jr., in the Contra Costa proceeding, in which they reported to the Bureau mother's Native American ancestry as "Blackfoot" or "Blackfeet." At that time, mother told a social worker that she wanted to find out more about her ancestry, and she apparently mentioned that she might be connected with the Seminole Tribe. Mother also

4

expressed "her intention to find more information regarding Native American Ancestry from her relatives," but the record does not indicate that she acted on that intention.

Reunification services were provided to mother and father. While in foster care, K.R.'s medical condition improved, and R.R, Jr., thrived. Mother, however, suffered from severe mental health problems. She refused the Bureau's requests for her to be assessed and treated, and her behavior during visits with K.R. and R.R., Jr., indicated a lack of closeness with the children. Eventually, mother stopped visiting the children altogether and, after November 2011, she participated in no further reunification services. Father conceded his inability to care for the children. The Bureau identified adoptive homes for the children with paternal relatives, and father was grateful that his family members were willing to adopt them. The juvenile court terminated reunification services at a contested hearing in May 2012.

Meanwhile, citing the ICWA investigation in K.R.'s Sonoma County case, the Bureau concluded that it was unlikely R.R., Jr., would be found to be an Indian child since K.R. was not one. Nevertheless, it requested a hearing to ensure compliance with ICWA, and a second ICWA-030 was prepared from information the Bureau had received during the prior year.

The second ICWA-030 was sent in June 2012 to the Bureau of Indian Affairs, the Department of the Interior, and the Blackfeet Tribe in Montana, the same tribe that the Department had notified when the case was in Sonoma County. Based on the additional information received from mother or elsewhere, the Bureau also sent notice to the Seminole Tribes in Florida and Oklahoma. The notice identified James H., grandfather, and Rosia S.-H. and "Vanuel" H., Sr., great-grandparents, as relatives with possible Native American heritage. The notice included their approximate birth places, stated that the great-grandparents were deceased, and provided the birth date for James H. and birth year for Rosia S.-H. Many spaces on the form stated "client has no information."

The Bureau received responses from the Blackfeet Tribe and the Seminole Nation of Oklahoma, which both reported R.R., Jr., was not considered an Indian child under ICWA.

5

The permanency planning hearing was held on August 23, 2012. No objections to the ICWA notices were asserted. After receiving and reviewing the ICWA documents, the juvenile court found that proper notice had been given and concluded that R.R., Jr., was not an Indian child. By this time, K.R. and R.R., Jr., had been placed in their prospective adoptive homes, and the court found that they were likely to be adopted. The court terminated mother's and father's parental rights. Mother appealed.

DISCUSSION

ICWA was enacted to " 'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.' " (*In re Karla C.* (2003) 113 Cal.App.4th 166, 173-174, quoting 25 U.S.C. § 1902.) Under ICWA, an "Indian child" is a person who is a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4).) "ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions. [Citation.] If there is reason to believe a child that is the subject of a dependency proceeding is an Indian child, ICWA requires that the child's Indian tribe be notified of the proceeding and its right to intervene." (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1396; see 25 U.S.C. § 1912(a).) These notice requirements are strictly construed because a tribe's right to intervene is meaningless if the tribe is unaware of the proceeding. (*Karla C., supra,* at p. 174.)

Although ICWA itself provides little guidance on the content of tribal notices, additional direction is found in federal regulations and California law. Section 224.2, tracking the relevant federal regulation, provides that the ICWA notice should include, *if known*, the following information regarding the child and family members: (1) the name, birth date, and birthplace of the Indian child; (2) the name of the Indian tribe in which the child is a member or may be eligible for membership; and (3) the names and addresses of the child's parents, grandparents, great-grandparents and other identifying information. (*Id.*, subd. (a)(5)(A)-(C); see 25 C.F.R. § 23.11(a), (d); see also *In re I.W.* (2009) 180 Cal.App.4th 1517, 1529; Cal. Rules of Court, rule 5.481.)

6

On appeal, mother contends for the first time that the ICWA-030 notices were inadequate because one was not sent to the Crow Tribe, and the information provided on the notices to the other tribes was incomplete.[3]  Without describing the incomplete information with specificity, mother argues that the "first ICWA notice omitted essential information about the maternal side of the family and virtually nothing about the paternal side . . . .  [T]he Agency should have interviewed [mother's relatives] regarding names and information related to [the question of Native American heritage] and, then sent an amended notice to the Crow and Blackfoot tribes."  Mother concedes that the second notice "shows information for [mother] and father, and the names and birthdates of the maternal grandparents. . . ."  But she argues that "the Agency had the names and contact information of at least four maternal relatives who could have easily provided additional information . . . ."

We extrapolate from these arguments and from our review of the ICWA-030 notices that mother's specific complaints are that (1) a notice was not sent to the Crow Nation; (2) the first ICWA-030 failed to include paternal information; and (3) both ICWA-030s failed to include addresses or conclusive birth dates for mother's father and grandfather, and this information could have been discovered if the agencies had made inquiries with mother's relatives.  We will address each of these complaints separately.[4]

---

[3] We follow the majority of courts that have held that a parent's failure to object to the ICWA notice in the lower court proceedings does not forfeit the issue on appeal because tribal interests, not just parental interests, are implicated.  (See, e.g., *In re Z.N.* (2009) 181 Cal.App.4th 282, 296-297; *In re J.T.* (2007) 154 Cal.App.4th 986, 991.)  In doing so, we recognize that some courts have found exceptions to this non-forfeiture rule in circumstances not present here, such as when the tribe participated in the lower court proceedings.  (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1159-1160.)

[4] In light of our conclusions below, we need not and do not resolve whether the ICWA-030 notices were required to be sent at all in this case.  We note, however, that throughout the dependency proceedings, mother's speculation about her Native American heritage was uncertain and changing.  Her most consistent claim was her belief that she may have Blackfeet heritage because "her paternal grandfather [her children's great-grandfather], Danual [H.], Sr., was full Blackfoot."  As mentioned above, under ICWA, an "Indian Child" means any unmarried person who is under age eighteen and is either

7

*1.*     *Failure to Provide Notice to Crow Nation*

Mother contends that notice should have been sent to the Crow Nation in Montana. Mother's only suggestion of Crow ancestry, however, *predated* the dependency proceedings. Not once throughout the entire dependency proceedings—from the filing of the first dependency petition in February 2011 through the termination of parental rights in August 2012—did mother ever claim Crow ancestry. During this time, there were numerous occasions when ICWA issues were raised, and mother could have mentioned (and had an obligation to mention) possible Crow heritage. These occasions included when mother filled out the first ICWA-020 under penalty of perjury;[5] at the detention hearing on February 10, 2011; when mother was asked to provide information to fill out the first ICWA-030; when mother submitted the second ICWA-020 under penalty of perjury; when mother provided information used to fill out the second ICWA-030; and at the hearing on August 14, 2012, when parental rights were terminated. It is disingenuous for mother to argue now that an ICWA notice should have been sent to the Crow Nation when she affirmatively and consistently failed to mention possible Crow heritage during the dependency proceedings.

---

(a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe *and* is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4).) We recognize that one purpose of notifying the tribes under ICWA is to help figure out whether a child meets this definition. And we recognize that tribes may have different eligibility criteria. But in this case, other than mother's speculation that the children's great-grandparents and grandfather were fully or partially Native American, there is little reason to believe that mother was an actual tribal member and that the children were eligible to become members. The tribal affiliation of a dependent child's grandparent or great-grandparent, standing alone, may be insufficient to trigger ICWA-notification requirements unless there are other reasons to suggest that the child is a tribal member or is eligible for membership and has a biological parent who is a member. (*In re Z.N., supra,* 181 Cal.App.4th at p. 298; see also *In re Shane G.* (2008) 166 Cal.App.4th 1532, 1536-1539 [grandmother's statement that minor's great-great-great-grandmother was a Comanche princess insufficient to trigger ICWA notice requirement when there was no reason to believe mother or her children were or ever had been tribal members].)

[5] This form appears to have been signed by mother's counsel.

Still, we might have considered a remand for the limited purpose of providing notice to the Crow Nation if mother had made an affirmative representation of Crow ancestry in her briefing to this court. She did not. In the absence of any affirmative claim of Crow heritage in the proceedings below and on appeal, we find no prejudice and no reason to reverse. (See *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1431 [no prejudice in absence of appealing parent's affirmative representation of Indian heritage]; see also *In re N.E.* (2008) 160 Cal.App.4th 766, 771 [no prejudice where father does not suggest in his brief that he in fact has Indian heritage].)

2.      *Failure of First ICWA-030 to Include Paternal Information*

Mother also complains that the first ICWA-030 contained "virtually nothing about the paternal side." We conclude that if the notices were deficient for lacking more details about paternal relatives, the deficiencies were harmless. To begin with, the ICWA-030s *did* include information about the child's paternal relatives because they included father's name and identifying information. This information, more than any other on the paternal side, would have been the most helpful in evaluating whether K.R. was an Indian child under ICWA by being the biological child of a member of an Indian tribe. (See 25 U.S.C. § 1903(4).)

Father had affirmatively disclaimed any Native American heritage, and the record is devoid of evidence suggesting any. The ICWA-020s father submitted under penalty of perjury unambiguously reflects his denial of Native American heritage. Next to his information on the first ICWA-030, there is a notation "NO ICWA," plainly indicating that no paternal-side Indian heritage was being claimed or suggested.

Under these facts, there is no reason to believe that the inclusion of additional information about father's non-Native American relatives would have led a tribe to conclude that K.R. was an Indian child under ICWA. Mother cites no authority, and we are aware of none, finding prejudicial error because an ICWA notice failed to include the names of grandparents and other relatives on a side of a family in which no Native American heritage is claimed. (See *In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 577 [deeming harmless omission of information in notice concerning non-Native American

9

relatives and pointing out that information about non-Native American relatives is useful for *excluding*, rather than including, child or parent from tribal rolls].)

3. *Adequacy of Specific Information in ICWA-030s*

The first ICWA-030 identified two maternal relatives who were believed to have possible Native American heritage: grandfather James H., and great-grandfather Danual H., Sr. No addresses for them were provided, but a birthplace and date were provided for James H., and a birthplace and partial birth date were provided for Danual H., Sr. The second ICWA-030 notice identified three maternal relatives who were believed to have possible Native American heritage: grandfather James H., great-grandfather "Vanuel" H., Sr., and great-grandmother Rosia S.-H. The notice included approximate birth places for these relatives, stated that the great-grandparents were deceased, and provided the birth date for James H. Many spaces on the form stated "client has no information."

Mother's primary complaint about the lack of specificity in the ICWA-030s appears to be based on her claim that "the Agency had the names and contact information of at least four maternal relatives who could have easily provided additional information . . . ." The apparent legal basis for her argument is the requirement in section 224.2, which directs the ICWA notice to include, if known, "the names and addresses of the child's parents, grandparents, great-grandparents and other identifying information," in conjunction with the requirement of section 224.3, subdivision (c), which directs further inquiry when "the court, social worker, or probation officer knows or has reason to know that an Indian child is involved . . . by interviewing . . . extended family members . . . ."

We are not persuaded that mother has demonstrated error, much less prejudicial error. To begin with, the factual premise of this argument—that further inquiry was required but never made—is incorrect. Contrary to mother's contention, the record reflects that an inquiry *was* made into mother's claim of tribal affiliation. As discussed above, a Sonoma County court investigator contacted several relatives of mother in May 2011 and discussed some tribal issues. The investigator reported: "[Sister] confirmed

10

that they are not affiliated with any tribal counsel [*sic*] and have never received any benefits." The investigator also contacted another sister, an aunt, and mother's father, James H. James H. reported that he had not seen his daughter (mother) in a few years, but that he had noticed her mental illness early in her life and believed he had made a mistake in not getting her help.

It is true that the investigator did not record any discussion with James H. about Native American ancestry, and we are unable to conclude definitively whether any such discussion took place. And, on the record before us, we cannot say if the other maternal relatives were contacted and asked to provide additional information about James H. or his parents. But the Blackfeet tribe twice responded that it did not find James H. on its membership roles. It also responded that it did not find his father (the children's great-grandfather), "Danual H." or "Vanuel H.," or his mother (the children's great-grandmother), "Rosia S.-H.," on its membership rolls. The Seminole Nation of Oklahoma similarly reported that no one listed on the second ICWA-030 was on its membership rolls. No tribe asked for additional or clarifying information.

Nothing in this record persuades us that further inquiry of James H. or any of the other maternal relatives would have resulted in K.R. or R.R., Jr., being found to be an Indian child within the meaning of ICWA. Any deficiencies were accordingly harmless. "[W]here notice has been received by the tribe, as it was in this case, errors and omissions in the notice are reviewed under the harmless error standard." (*In re E.W.* (2009) 170 Cal.App.4th 396, 402-403; see also *In re H.B.* (2008) 161 Cal.App.4th 115, 121; *In re Cheyanne F., supra,* 164 Cal.App.4th at p. 577; *Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 784.)

K.R. and R.R., Jr., deserve permanency and stability. A "strong policy in dependency cases [is] that they 'be resolved expeditiously.' " (*In re. Z.N., supra*, 181 Cal.App.4th at p. 301.) "Parents unable to reunify with their children have already caused the children serious harm; the rules do not permit them to cause additional unwarranted delay and hardship, without any showing whatsoever that the interests protected by the ICWA are implicated in any way." (*In re Rebecca R., supra,*

11

143 Cal.App.4th at p. 1431.)  We decline to remand this case for the purpose of providing yet another ICWA notice because to do so would essentially "condone delaying that permanence for an empty exercise with a preordained outcome."  (*In re. E.W., supra,* 170 Cal.App.4th at p. 402.)

DISPOSITION

The order terminating parental rights is affirmed.


_____

Humes, J.


We concur:


_____

Reardon, Acting P.J.


_____

Rivera, J.